UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:                                                    Case No. GK 17-05398-jtg

SPIECH FARMS, LLC,                                        Chapter 11

                    Debtor.                               Hon. John T. Gregg

_____/

**OPINION REGARDING PACA**
**CLAIM OF PRODUCE PAY, INC.**

APPEARANCES:  Cody Knight, Esq. and Steven L. Rayman, Esq., RAYMAN & KNIGHT, Kalamazoo, Michigan for Spiech Farms, LLC; Jason R. Klinowski, Esq. and Katie E. Willoughby, Esq., WALLACE JORDAN RATLIFF & BRANDT LLC, Birmingham, Alabama for Produce Pay, Inc.; Elisabeth M. Von Eitzen, Esq., WARNER NORCROSS & JUDD LLP, Grand Rapids, Michigan for the Official Committee of Unsecured Creditors; Henry L. Knier, Jr., Esq., SMITH MARTIN, POWERS & KNIER, P.C., Bay City, Michigan for Chemical Bank

Produce Pay, Inc. ("Produce Pay") asserts a claim under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499 *et seq.* ("PACA") against Spiech Farms, LLC, the debtor-in-possession in this chapter 11 case (the "Debtor").  Produce Pay argues that its PACA claim arises from the following two separate transactions with the Debtor.  First, the Debtor allegedly sold produce to Produce Pay via a software platform.  Second, the Debtor, acting as Produce Pay's consignee, sold the produce that Produce Pay purchased moments earlier, to the Debtor's pre-existing customers.  Produce Pay contends that, as an unpaid seller or supplier of perishable agricultural commodities, it is a PACA trust beneficiary entitled to have its claim satisfied ahead of all other non-PACA creditors, including Chemical Bank, the Debtor's prepetition secured lender ("Chemical").  Alternatively, Produce Pay argues that when it purchased the Debtor's "right, title and interest" in produce, it also purchased the Debtor's receivables, including the Debtor's status as a PACA trust beneficiary.

The Debtor and the Official Committee of Unsecured Creditors (the "Committee") object to what they perceive as an attempt by Produce Pay to contort PACA.  They argue, among other things, that Produce Pay has no PACA claim because the Debtor did not sell produce to Produce Pay, as title to the same produce had previously been transferred to the Debtor's pre-existing customers.  The Debtor and the Committee further contend that the transactions between the Debtor and Produce Pay constitute a financing arrangement, not a true sale.  As such, they argue that Produce Pay did not purchase produce or anything else from the Debtor.[1]

For the following reasons, the court shall sustain the objections and disallow Produce Pay's claim under PACA.[2]

## JURISDICTION

The court has jurisdiction pursuant to 7 U.S.C. § 499e(c)(5), 28 U.S.C. § 157(a), 28 U.S.C. § 1334(a) and LCivR 83.2(a) (W.D. Mich.).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).  Regardless, the parties have all consented to the entry of a final judgment or order by this court.  *See* 28 U.S.C. § 157(c); *see also Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, 135 S. Ct. 1932 (2015) (bankruptcy court has constitutional authority to enter final judgment or order upon consent of parties).

## BACKGROUND

The Debtor is a Michigan limited liability company that purchases, processes and packages blueberries and grapes in Michigan and Georgia.  The Debtor sells its produce to national grocery

---

[1]     The Debtor and the Committee also raised several other arguments, including that (i) Produce Pay was subject to an unidentified preclusionary principle as a result of the cash collateral order, (ii) Produce Pay failed to strictly comply with notice and payment term requirements under PACA, and (iii) Produce Pay inflated the amount of its PACA claim.  It is unnecessary to address these arguments given the court's decision herein.

[2]     The following constitutes the court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052. Citations to "[Dkt. No. __]" are to entries on the docket in this case.

chains such as Wal-Mart, Meijer, Publix, Whole Foods and Kroger. According to the Debtor, it produces more than 80% of the fresh Concord grapes in the United States and is the largest producer of fresh table grapes east of the Mississippi River. (Ex. NNN at 32:5-7). At all relevant times, the Debtor was a licensed PACA dealer. (Ex. JJJ).

*A.      The Debtor's Prepetition Financing Relationships*

In the years leading up to its bankruptcy, the Debtor primarily relied on Chemical to finance its operations. In exchange for term loans and lines of credit in excess of $4 million, the Debtor granted Chemical first priority mortgage liens and security interests in substantially all of the Debtor's assets [Dkt. No. 253].

In early 2017, the Debtor began to experience financial distress due, in large part, to a frost that severely damaged, if not destroyed, its blueberry crop in Georgia. (Ex. NNN at 117:8-22). Without sufficient cash flow from the Georgia crop, the Debtor fell out of formula on at least one of its lines of credit with Chemical. (Ex. NNN at 177-78; Hr'g Tr. 116:3-20). As an accommodation, Chemical extended a "bridge loan" to the Debtor. (Hr'g Tr. 116:3-7). Notwithstanding this accommodation, the Debtor continued to struggle financially.

In the Spring of 2017, the Debtor began to consider alternative means by which to finance its operations. (Ex. NNN at 131-32). One alternative source of financing was offered by Produce Pay, a licensed PACA dealer based in Los Angeles, California. (Hr'g Tr. 14:6, 18-19). Produce Pay contacted the Debtor in late April 2017 and generally marketed its services as follows:

> Produce Pay is a multi-service finance company focused exclusively on the fresh produce space. We provide access to cash flow, anywhere in the world, the day after you ship your produce to the U.S. This would minimize risk and exposure by ensuring you and your base of growers have operational capital without tying up your own business' assets.

(Ex. EE). Throughout May 2017, the Debtor and Produce Pay discussed the possibility of entering into a financing arrangement. (Ex. EE; Ex. FF; Ex. GG). During these discussions, the Debtor informed Produce Pay that the Debtor had granted Chemical an interest in its accounts receivable, a fact that did not deter Produce Pay. (Ex. EE). Nonetheless, the parties were unable to come to any agreement and their discussions ended in late May 2017. (Ex. NNN at 132:10-12).

Over the next few months, the Debtor's financial condition continued to worsen. In mid-August 2017, the Debtor recommenced discussions with Produce Pay. (*Id*. at 132-33). During their negotiations, Produce Pay and the Debtor contemplated an arrangement centered around the Debtor's accounts receivable. (Ex. JJ; Ex. KK; Ex. PP; Ex. QQ).

On August 31, 2018, the Debtor and Produce Pay entered into a Distribution Agreement (the "Agreement") designed to provide the Debtor with access to the funds it desperately needed. (Ex. G). While creative, the Agreement is at times confusing, perhaps purposely so. It contains shades of a true sale, factoring, consignment, securitization, and even hints of PACA.[3] The maze of defined terms makes interpretation of the Agreement a challenging exercise, especially since, according to Produce Pay, the Agreement is simply for the sale of fruit.

The Agreement was structured to effectuate two primary transfers, which Produce Pay describes as "two separate, simultaneous transactions between the Debtor and Produce Pay." [Dkt. No. 385]. First, Produce Pay agreed to purchase from the Debtor "Distributed Asset Pools," which by definition under the Agreement includes produce.[4] (Ex. G, Agr. at § 2.1). Under the

---

[3]        Although the Agreement calls for the sale of produce, not once does it refer to PACA.

[4]        A "Distributed Asset Pool" is defined as "the portion or amount of any Asset Pool actually sold and distributed, on a consignment basis" by the Debtor. (Ex. G, Agr. at § 2.1). "Asset Pool," in turn, is defined as "Produce sold in one or more allotments from [the Debtor] to [Produce Pay]." (*Id*.). Finally, "Produce" is defined as "all products, items and goods, including but not limited to, fruits, vegetables, grains, root, crops of the forest, in their natural or unprocessed states and in all of their respective varieties, produced by a farmer and purchased by [Produce Pay]." (*Id*.).

Agreement, Produce Pay could, in its sole discretion, purchase a Distributed Asset Pool for the "Asset Pool Purchase Price."[5]  (Ex. G, Agr. at § 1(e); Ex. JJJ, Dusastre Decl. at ¶ 6).  Throughout the course of the parties' relationship, Produce Pay deemed the Asset Pool Purchase Price for all Distributed Asset Pools to be 50% of the accounts receivable due to the Debtor from its customers. (Hr'g Tr. 39-40).

Second, the Debtor agreed to act as Produce Pay's "consignment agent" by selling to the Debtor's pre-existing customers, on behalf of Produce Pay, the same produce that Produce Pay had allegedly just purchased as part of a Distributed Asset Pool. (Ex. G, Agr. at § 3.2; Ex. JJJ, Dusastre Decl. at ¶¶ 29-30).  As Produce Pay's consignment agent, the Debtor was required to remit the "Company Proceeds" to Produce Pay, plus sales commissions, marketing commissions and certain expenses, including the costs of collection.[6]  (Ex. G, Agr. at §§ 1(b), (j), (k), 6.1; Ex. JJJ, Dusastre Decl. at ¶¶ 35-39).

The Agreement itself does not identify any Distributed Asset Pools or produce for sale. Instead, it contemplates that the Debtor will designate produce to the Agreement at some point in the future, which the Debtor did by uploading "pallet reports" through a software platform

---

[5]     The "Asset Pool Purchase Price" is defined as "with respect to any Distributed Asset Pool, the price paid by [Produce Pay] to the [Debtor] to purchase the Distributed Asset Pool, which amount shall be the Asset Pool Initial Purchase Price, plus the Asset Pool Supplemental Purchase Payment, if any." (Ex. G, Agr. at § 2.1). The "Asset Pool Initial Purchase Price" is defined as "the lesser of (a) the Assumed Ratio multiplied by the underlying Produce's prevailing market price, which shall be determined by [Produce Pay] in its sole discretion, or (b) the Assumed Ratio multiplied by the underlying Produce's five-year historical index sale value, as determined by [Produce Pay] by reference to the United States Department of Agriculture's Market News website (https://www.marketnews.usda.gov/mnp/fv-home), or any successor or substitute of the foregoing website providing five-year historical index sale values comparable to those currently provided by such website." (*Id.*).  The "Asset Pool Supplemental Purchase Payment" is defined as "with respect to any Distributed Asset Pool, an amount equal to (a) the product of: (i) the difference of (A) the Supplemental Purchase Payment Rate set forth in the Transaction Terms, less (B) the Assumed Ratio, multiplied by (ii) the expected Gross Sales Proceeds for that Distributed Asset Pool entered into the Platform by the [Debtor] after its sale of that Distributed Asset Pool, less (b) the Asset Pool Initial Purchase Price." (*Id.*).

[6]     "Company Proceeds" are defined as "with respect to a particular Distributed Asset Pool, the sum of the Asset Pool Purchase Price, the Sales Commission, the Marketplacing Commission, and the Company Expenses." (Ex. G, Agr. at § 2.1).

proprietary to Produce Pay.  (Ex. G, Agr. at § 1; Hr'g Tr. 27:1-4).  If Produce Pay decided to purchase the Distributed Asset Pool identified on a pallet report, it paid the Asset Pool Initial Purchase Price and transmitted an email to the Debtor advising it that funds had been wired to its account.  (H'rg Tr. 65:7-13; Ex. R-2).  Produce Pay also sent the Debtor a "confirmation of sale" through the platform.  (Hr'g Tr. 28:8-14; Ex. JJJ).  Produce Pay described this process as "digital no touch, no see transactions."  (Hr'g Tr. 26:24-25).

The Agreement further provided that Produce Pay would never take physical possession of any produce. (Ex. G, Agr. at § 4.2; Hr'g Tr. 26:24-25).  The risk of loss under the Agreement remained with the Debtor at all times.  (Hr'g Tr. 102:3-13).  In the event that the Debtor's customers did not pay the Debtor for the produce it was allegedly selling to them on behalf of Produce Pay, the Debtor was required to repurchase the Distributed Asset Pool.  (Ex. G, Agr. at § 6.4).  The Debtor was obligated to sell at least $1 million of Distributed Asset Pools to Produce Pay on an annual basis.  (*Id.* at § 6.3).

On or around September 8, 2017, the Debtor began to access funds under the Agreement. (Ex. 16).  Unfortunately, the Debtor's new relationship with Produce Pay was hardly the financial solution it had hoped for.  While conducting a search of financing statements in early September 2017, Chemical discovered that Produce Pay had filed a financing statement against the Debtor on September 1, 2017, one day after entering into the Agreement.  (Hr'g Tr. 144:8-9; Ex. Q).  In a meeting with the Debtor shortly thereafter, Chemical expressed concern over Produce Pay's alleged security interest in the Debtor's assets but was unaware of the complicated structure of the Agreement or Produce Pay's confirmations of sale, including the reservation of PACA trust language contained therein.  (Hr'g Tr. 123-125).

In subsequent communications, the Debtor informed Chemical that it was selling produce to Produce Pay, as reflected in one of the Debtor's borrowing base certificates which disclosed a "Contra/Retention/PACA Payable" in the amount of $614,284.82.   (Ex. 7; Hr'g Tr. 123-24). Towards the end of October 2017, the Debtor told Chemical that it believed Produce Pay was entitled to protections under PACA. (Hr'g Tr. 126-28; Ex. 40; Ex. 41).  It was at this time that Chemical realized Produce Pay was attempting to circumvent Chemical's security interest by asserting rights under PACA.  (Hr'g Tr. 125:2-8; Ex. 40).

In a letter dated October 30, 2017 and in subsequent correspondence, Chemical formally declared the Debtor to be in default.  (Ex. 8; Ex. 40).  Chemical demanded that the Debtor notify its customers, as account debtors, that they were required to remit all future payments jointly to the Debtor and Chemical.  (Ex. 8).  Over the next eight days, Chemical also effectuated setoffs of more than $570,000 from the Debtor's deposit accounts.  (Ex. 9).

Around the same time that Chemical was scrutinizing the Debtor's transactions with Produce Pay, the Debtor's relationship with Produce Pay began to deteriorate.  On October 2, 2017, Produce Pay notified the Debtor that it had yet to receive the first two payments due under the Agreement.  (Ex. 19).  Produce Pay reminded the Debtor that it currently owed $190,000, which would soon increase to $327,000.  (*Id.*).  In response, the Debtor proposed to apply new "files" toward the outstanding indebtedness.  (*Id.*).  Produce Pay rejected the Debtor's proposal. (*Id.*).  Produce Pay informed the Debtor that it would need to begin to remit funds in satisfaction of the initial transactions before additional funds would be made available.  (*Id.*).

Throughout October 2017, the Debtor failed to make payments to Produce Pay with much consistency.  (Ex. 22).  Nonetheless, over the course of their short-lived relationship, the Debtor

managed to remit over $640,000 to Produce Pay, which allowed the Debtor to continue to receive new funds under the Agreement. (Ex. S).

In November 2017, as the Debtor was preparing to make a significant payment to Produce Pay, Chemical effectuated its setoffs, thereby depriving the Debtor of the funds it needed to partially satisfy Produce Pay. (Ex. NNN at 139:9-11). Produce Pay reacted by declining to make additional "advances." (Ex. 20). Produce Pay also notified the Debtor that it was prepared to take legal action unless the Debtor immediately proposed a payment plan acceptable to Produce Pay. (*Id.*). No such payment plan was forthcoming, however. Without any cash and millions of dollars in debt to Chemical and Produce Pay, the Debtor was unable to continue to fund its operations.

B.      *The Bankruptcy Filing and Produce Pay's PACA Claim*

On November 22, 2017, the Debtor filed a voluntary petition for relief under chapter 11. The Debtor's case was contentious from the beginning. Chemical and Produce Pay both objected to the Debtor's use of cash collateral [Dkt. Nos. 18, 20]. After an evidentiary hearing over the course of several days, the court authorized the Debtor to use cash collateral on a final basis [Dkt. No. 253].[7]

As is common in bankruptcy cases involving PACA, the Debtor filed a motion to establish certain procedures related to PACA claims [Dkt. No. 128]. The court entered an order granting the Debtor's motion on March 1, 2018 [Dkt. No. 220]. Among other things, the order required any person asserting a claim under PACA to file a proof of claim and supporting documents by no later than May 14, 2018.

---

[7]      Produce Pay withdrew its objection to the Debtor's use of cash collateral on March 9, 2018 [Dkt. No. 238]. Thereafter, the Debtor, the Committee and Chemical stipulated to the Debtor's use of cash collateral [Dkt. No. 243].

Produce Pay timely filed its proof of claim on April 13, 2018 [Claim No. 111].  The proof of claim is supported by numerous documents, including pallet reports, confirmations of sale, and a sworn declaration from Benjamin Dusastre, the chief financial officer of Produce Pay.  (Ex. JJJ). In its proof of claim, Produce Pay asserts that it has a valid PACA claim in the amount of $1,002,273.70.  The Debtor and the Committee filed timely objections to Produce Pay's claim, after which Produce Pay filed a reply [Dkt. Nos. 354, 357, 385].[8]  All three parties also filed pretrial briefs [Dkt. Nos. 525, 526, 528].

The court held an evidentiary hearing on September 24, 2018.  At the hearing, the parties stipulated to the admissibility of over ninety exhibits [Dkt. No. 530], including certain testimony of Mr. Timothy Spiech, the Debtor's president, from the evidentiary hearing regarding the Debtor's use of cash collateral.[9]  The court also heard testimony from Mr. Dusastre and Ms. Joan Johnson, a vice president at Chemical.  While all three witnesses were credible, they were also understandably confused by the legal structure of the transactions between the Debtor and Produce Pay.  At the conclusion of the hearing, the court took the matter under advisement.

## DISCUSSION

The sole issue before the court is whether Produce Pay has a valid PACA claim against the Debtor.  The parties devote the majority of their briefing to PACA.  PACA, however, is not the only relevant statutory authority.  State commercial law, including Article 2 and Article 9 of the Uniform Commercial Code (the "U.C.C."), is also directly applicable to the dispute.

---

[8]     Chemical filed a short joinder to the Debtor's objection on May 14, 2018 [Dkt. No. 358].

[9]     The court appreciated the parties' efforts to stipulate to the admissibility of documents and prior testimony.

*A.     PACA Framework - 7 U.S.C. § 499 et seq.*

PACA was initially enacted to protect farmers and growers by regulating the sale of perishable commodities.  *See, e.g.*, *Bocchi Americas Assocs., Inc. v. Commerce Fresh Mktg., Inc.*, 515 F.3d 383, 387-88 (5th Cir. 2008).  PACA was designed to:

> encourage fair trading practices in the marketing of perishable commodities by suppressing unfair and fraudulent business practices in marketing of fresh and frozen fruits and vegetables . . . and providing for collecting damages from any buyer or seller who fails to live up to his contractual obligations.

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1066 (2d Cir. 1995) (citing H.R. Rep. No. 543, 98th Cong., 1st Sess. 3 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 405, 406).

In 1984, Congress amended PACA to create for the benefit of unpaid sellers and suppliers a non-segregated floating trust comprised of perishable agricultural commodities and any accounts receivable or proceeds from the sales of such commodities.  *Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361, 364-65 (6th Cir. 2003) (citations omitted); *see* 7 C.F.R. § 46.46(b).  The legislative history explains the policy behind the 1984 amendment as follows:

> [Purchasers/Distributors of perishable agricultural commodities] in the normal course of their business transactions, operate on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency.  Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by contract.

*S & H Packing & Sales Co., Inc. v. Tanimura Distrib., Inc.*, 883 F.3d 797, 802 (9th Cir. 2018) (quoting H.R. Rep. No. 543 98th Cong., 1st Sess. 3 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 405, 407); *see Overton Distribs.*, 340 F.3d at 365.

PACA currently provides, in pertinent part, that produce received by a commission merchant, dealer, or broker and any receivables or proceeds from the sale of such produce, shall

be held by the merchant, dealer or broker "in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents." 7 U.S.C. § 499e(c)(2).  Through this trust, a produce seller or supplier maintains a right to recover superior to a buyer's other non-PACA creditors, including secured creditors.  7 U.S.C. § 499e(c)(1); *In re Cherry Growers, Inc.*, 576 B.R. 569, 572 (Bankr. W.D. Mich. 2017).

PACA only protects unpaid "sellers" and "suppliers" of perishable agricultural commodities.  PACA does not define those terms, however.  When the meaning of a term that is neither considered a term of art nor expressly defined by statute is in question, a court should consult the ordinary meanings contained in general and legal dictionaries.  *See, e.g.*, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).

Applying this canon of construction, a "seller" is defined as, among other things, a person who sells or contracts to sell goods; the party who transfers property in the contract of sale. BLACK'S LAW DICTIONARY 1360 (6th ed. 1990); U.C.C. § 2-103(1)(d).  A "supplier," or the corollary "to supply," is defined as all persons in the chain of production or marketing; one who furnishes what is wanted.  BLACK'S LAW DICTIONARY 1439 (6th ed. 1990).

In order to recover from a PACA trust, an alleged trust beneficiary must demonstrate by a preponderance of the evidence that: (i) the goods sold were perishable agricultural commodities; (ii) the purchaser of the perishable agricultural commodities was a commission merchant, a dealer, or broker; (iii) the transaction occurred in interstate or foreign commerce; (iv) full payment on the transaction has not been received by the supplier, seller or agent; (v) the seller or supplier preserved its trust rights by giving written notice to the purchaser; and (vi) the payment terms did not exceed the maximum amount prescribed by PACA.  *A & J Produce Corp. v. Chang*, 385 F.Supp.2d 354,

358 (S.D.N.Y. 2005) (citations omitted); *La Grasso Bros. Inc. v. Am. Foodservice, L.L.C.*, 2011 WL 891221, at \*4 (E.D. Mich. Mar. 11, 2011) (citations omitted); *cf. Sanzone-Palmisano Co. v. M. Seaman Enters., Inc.*, 986 F.2d 1010, 1013-14 (6th Cir. 1993) (produce buyer has burden to demonstrate assets are not part of trust *res*).

B.      *The Debtor Did Not Transfer Title to Produce to Produce Pay – U.C.C. § 2-101 et seq.*

Produce Pay, as an alleged beneficiary of a PACA trust, must demonstrate that it is an unpaid seller or supplier of perishable agricultural commodities.  *See* 7 U.S.C. § 499e(c)(2). Relying on the Debtor's representations in the Agreement, Produce Pay summarily concludes that the Debtor transferred it title to produce.  Produce Pay thus posits that it became an unpaid seller or supplier of perishable agricultural commodities when the Debtor sold the produce to its existing customers on Produce Pay's behalf.[10]  The Debtor and the Committee dispute this assertion.  They argue that it was impossible for the Debtor to transfer title to produce to Produce Pay because the Debtor had already transferred title to its customers.

As a threshold matter, the court must determine whether PACA or state commercial law applies to the passage of title to perishable agricultural commodities.  PACA does not exclusively occupy the field of produce sales by displacing state commercial law.  7 U.S.C. § 499o.  Nor does state commercial law conflict with PACA or its purposes with respect to sales of perishable agricultural commodities.  *Id.*  Therefore, state commercial law continues to apply to transactions involving the sale of perishable agricultural commodities where PACA is silent, including passage of title.  *See Six L's Packing Co., Inc. v. Beale*, 524 Fed. Appx. 148, 154 n.5 (6th Cir. 2013)

---

[10]      The parties agree that the Debtor's produce constitutes perishable agricultural commodities under PACA. *See* 7 U.S.C. § 499a(b)(4)(A) (defining perishable agricultural commodities).

(citations omitted) (state commercial law applies to sales of produce where PACA silent as to material part of transaction).

Article 2 of the U.C.C. applies to the sale of goods, including produce.  U.C.C. §§ 2-102; 2-105(1).[11]  The parties agree that the Agreement nominally transfers title of Distributed Asset Pools, which purportedly includes produce, from the Debtor to Produce Pay for a price.  *See* U.C.C. § 2-106(1).  The parties disagree, however, whether the Debtor had any title to produce to transfer to Produce Pay at the time that Produce Pay allegedly purchased a Distributed Asset Pool.

> 1.      *Transfer of Title to Goods Under the U.C.C.*

Section 2-403 of the U.C.C. addresses the transfer of title to goods by providing, in pertinent part, that "a purchaser of goods acquires all title which his transferor had or had power to transfer . . ." U.C.C. § 2-403(1).  Section 2-403 thus captures the legal maxim *nemo dat qui non habet*, or "nothing can confer what it does not possess."  *Parker v. Nagel (In re Nagel)*, 556 B.R. 336, 342 (Bankr. N.D. Ohio 2016) (citing *City of Chicago v. Morales*, 527 U.S. 41, 91 n.9 (1999) (Scalia, J. dissenting); *United States v. Harris*, 246 F.3d 566, 575 (6th Cir. 2001)).  To put it another way, a purported seller of goods generally cannot transfer title to property that it does not own.

Section 2-401 of the U.C.C. determines *when* the title to goods is transferred by providing, in pertinent part, that:

> (1)     Title to goods cannot pass under a contract for sale prior to their identification to the contract . . ., and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act.  Any retention or reservation of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.  Subject to these

---

[11]     Section 10.6(a) of the Agreement contains a Delaware choice of law provision.  (Ex. G, Agr. at § 10.6). Therefore, Article 2 as adopted by the State of Delaware, Del. Code tit. 6, § 2-101 *et seq*., applies.  The record does not establish whether the Debtor's agreements with its customers contain choice of law provisions.  Moreover, the parties did not address the applicable law in their briefs.  Ultimately, it does not matter.  Other than Louisiana, all states have adopted Article 2 of the U.C.C., including section 2-401.  For purposes of this decision, Louisiana law is similar to section 2-401 of the U.C.C.  *See* La. Civ. Code art. 2456.

provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed by the parties.

(2)     Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place . . .

(3)     Unless otherwise explicitly agreed where delivery is to be made without moving the goods,

(a)     if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

(b)     if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

U.C.C. § 2-401.  Section 2-401 thus establishes default rules with respect to the passage of title.

The U.C.C. allows the parties to a contract to determine when title to goods will pass, with certain exceptions.  First, title can never be deemed to pass *before* goods to the contract are identified.  U.C.C. § 2-401(1).  Absent an "explicit" agreement between the parties, section 2-501 provides default rules regarding identification.  U.C.C. § 2-501(1).  If goods are in existence and designated to the contract at the time it is formed, identification occurs simultaneously.  U.C.C. § 2-501(1)(a); *see Swanson v. Applied Process Tech. Int'l, LLC (In re Delta-T Corp.)*, 475 B.R. 495, 521 (Bankr. E.D. Va. 2012).  If the contract is for the sale of future goods, identification occurs when the goods are "shipped, marked or otherwise designated by the seller as the goods to which the contract refers," such as by inclusion of items on a purchase order or by similar means.  U.C.C. §§ 2-105(2); 2-501(1)(b); *see Arthur Glick Truck Sales, Inc. v. Stuphen East Corp.*, 914 F.Supp.2d 529, 542-43 & n.17 (S.D.N.Y. 2012).

Second, title can never be deemed to pass *after* goods are delivered to the buyer.  U.C.C. § 2-401(1); *see Stowers v. Mahon (In re Samuels & Co., Inc.)*, 526 F.2d 1238, 1246 (5th Cir. 1976) (en banc); *Clean Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 492 B.R. 445, 459-60 (Bankr. M.D.N.C. 2013) (citation omitted); *Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.)*, 407 B.R. 65, 75-78 (Bankr. D. Vt. 2009); *In re J. Adrian Sons, Inc.*, 205 B.R. 24, 26 (Bankr. W.D.N.Y. 1997); *see also* 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 4-31 (6th ed. 2017).  Where goods are delivered to a buyer, section 2-401 provides that any retention or reservation of title is limited to a security interest.  U.C.C. § 2-401(1); *see Derryberry v. FCA Leasing Corp. (In re DeVita Fruit Co.)*, 473 F.2d 585, 587-88 (6th Cir. 1973).

Finally, section 2-401(3) addresses delivery where goods are not moved.  Delivery is deemed to occur when a document of title is provided by the seller.  U.C.C. § 2-401(3).  If goods are already identified and no documents of title are to be provided, however, delivery occurs at the time of contracting.  *Id.*

Section 2-401 has been analyzed as follows:

> Section 2–401 pronounces two immutable rules to which every sales agreement is subject.  The first rule is that title cannot pass until goods are "identified to the contract."  . . . The second rule is that once goods are in the possession of the buyer, any reservation of an interest or title by the seller is deemed a security interest.  Subject to those two rules, the parties may otherwise determine by mutual agreement the point in the transaction that title will pass to the buyer.  If the parties do not explicitly agree on a point in time (*i.e.*, the date of the contract, upon delivery, etc.), Sections 2–401(2) and (3) provide default rules for determining the transfer of title of goods.  Specifically, if parties fail to explicitly agree on a time for passage of title and the goods are to be physically delivered by the seller to the buyer, title passes to the buyer upon physical delivery. . .  If the agreement is silent regarding passage of title and the goods are already in the place where the buyer will take possession, Section 2–401(3) provides that title passes upon the delivery of a "document of title" if one is contemplated, or at the time of contracting, if no "documents of title" are involved. . .

> In no event, however, may title remain in the seller after the buyer takes possession of the goods (or of a "document of title" to the goods, if applicable), regardless of the parties' agreement or intent.

*In re Rome Family Corp.*, 407 B.R. at 76-77 (emphasis omitted) (citations omitted) (quoting *Malloy v. Brazeal (In re Callahan)*, 2007 WL 3018946, at *4-5 (Bankr. N.D. Okla. Oct. 11, 2007)).

Another court has succinctly explained:

> Thus, although parties may explicitly agree in the contract how and when title to sold goods passes from the seller to the buyer, parties may not avoid all of the default rules set forth in these provisions because any modification is nonetheless "[s]ubject to *these* provisions and to the provisions and to the provisions of the article on secured transactions (Article 9). U.C.C. § 2-401(1) (emphasis added). Specifically, irrespective of any agreement between the parties, a seller may never retain title to goods that have already been delivered to the buyer, and any such retention is always reduced to a mere security interest in the delivered goods."

*In re Aleris Int'l, Inc.*, 456 B.R. 35, 41 (Bankr. D. Del. 2011) (emphasis in original) (citations omitted). In sum, section 2-401 provides a starting point (identification) and an ending point (delivery) for the transfer of title to goods.

   2.   *Title Passed to the Customers Prior to Identification Under the Agreement*

This court finds other courts' interpretation of section 2-401 to be well reasoned and applicable to the present dispute. The court must determine whether title to produce first passed to the Debtor's customers or Produce Pay. If title first passed to the Debtor's customers, the Debtor had no remaining title to transfer to Produce Pay as a matter of law.

Applying the relevant provisions of section 2-401 and section 2-501 of the U.C.C., the court concludes that the Debtor transferred title to the produce in Produce Pay's proof of claim to the Debtor's customers before that same produce was identified to the Agreement. The Agreement itself does not "explicitly" identify any produce designated for sale. *See* U.C.C. § 2-501(1). Instead, the Agreement provides that the Debtor will identify produce to the Agreement by

submitting information through the platform, which first occurred when the Debtor uploaded the pallet reports. (Ex. G, Agr. at § 1; Ex. JJJ; Ex. NNN at 149; Hr'g Tr. 27:1-4).

Each pallet report attached to Produce Pay's proof of claim states that the produce had been shipped and delivered to the Debtor's customer before the Debtor uploaded the pallet report to the platform.[12] (Ex. R; Ex. JJJ). Similarly, each pallet report and the corresponding invoices referenced therein state that the Debtor's customer had been invoiced before the produce in the pallet report was offered to Produce Pay through the platform. (Ex. JJJ; Ex. 50). According to the invoices, the Debtor delivered the produce to its customers before the pallet reports were electronically submitted to Produce Pay through the platform. Produce Pay's confirmations of sale include "ship dates," which Mr. Dusastre explained were the dates that the Debtor first identified a specific Distributed Asset Pool to Produce Pay by uploading a pallet report. (Ex. JJJ; Hr'g Tr. 31:13-21). With respect to every Distributed Asset Pool, the Debtor physically delivered produce to its customers before the Debtor designated produce for sale under the Agreement. (Ex. R; Ex. JJJ; Ex. NNN at 142-53; Ex. 50).

Produce Pay argues that "full" title to the produce did not pass to the Debtor's customers before Produce Pay was deemed to take title under the Agreement. (Hr'g Tr. 44:8-15, 88:5-6). According to Produce Pay, the Debtor retained some form of title even after it delivered produce to its customers because the customers had yet to remit payment to the Debtor. (*Id*. at 44:8-15, 89-90). Mr. Dusastre testified that:

> [b]ecause if we look at one of the pallets, the debtor had shipped that product to a client. That client has received legal title, physical delivery of it, but had not paid for it. So the Debtor still had equitable title to the produce. [Produce Pay] purchased that equitable title, including the PACA rights that [the Debtor] held against [its customers].

---

[12]   At the hearing, Produce Pay stipulated that all of the produce subject to its proof of claim had been shipped to the Debtor's customers before the transactions between the Debtor and Produce Pay occurred. (Hr'g Tr. 7-8).

(*Id.* at 90:4-10).

Produce Pay seemingly relies on the "cash sale" doctrine," which prior to the enactment of the U.C.C., permitted a buyer and seller to agree that title to goods sold remained with the seller until the seller was paid. *In re Samuels & Co., Inc.*, 526 F.2d at 1246. Produce Pay's reliance on the cash sale doctrine is misplaced. After goods are delivered, section 2-401 of the U.C.C. expressly limits the effect of any attempted reservation of title to a security interest, regardless of whether the sale is a cash sale or a credit sale. *Id*.; *G&B Aircraft Mgmt. v. Smoot (In re Utah Aircraft Alliance)*, 342 B.R. 327, 335 (B.A.P. 10th Cir. 2006).

Because the produce was not identified to the Agreement until the Debtor uploaded its pallet reports, Produce Pay could not have obtained title to the produce before that time. U.C.C. §§ 2-401(1), 2-501(1). With respect to each pallet report identified in Produce Pay's proof of claim, the Debtor physically delivered the produce to its customers prior to the produce being "shipped, marked or otherwise designated" to the Agreement by the Debtor. (Ex. R, Ex. JJJ, Hr'g Tr. 7-8). *See* U.C.C. § 2-501(1)(b). When the Debtor physically delivered the produce to its customers, title was deemed to pass. U.C.C. § 2-401. Produce Pay, therefore, never obtained title to the produce that is the subject of its PACA claim. Similarly, Produce Pay never had any possession or control of the produce, nor did it supply produce to anyone. The produce was gone in all respects before it was identified to the Agreement. As such, Produce Pay is not a seller or supplier of perishable agricultural commodities entitled to the status of a PACA trust beneficiary.[13]

---

[13]     In light of its conclusion, the court need not address whether Section 3.2 of the Agreement and the definition of "Distributed Asset Pool" are temporally incompatible or at least give rise to an ambiguity in the Agreement.

*C.      The Agreement Constitutes a Financing Arrangement  – U.C.C. § 9-101 et seq.*

Perhaps realizing that it never sold or supplied produce, Produce Pay opaquely advances an alternative argument.  Produce Pay contends that when it purchased a Distributed Asset Pool, it purchased all "right, title and interest" to the produce that was the subject of that Distributed Asset Pool.  The Agreement is relatively silent in this regard.  It states that upon payment for a Distributed Asset Pool, Produce Pay has all "right, title and interest" in a Distributed Asset Pool, and that the Debtor is required to execute any documents to effectuate such "conveyance and assignment."  (Ex. G, Agr. at § 3.2).

In its reply brief, Produce Pay states without further discussion or analysis that such "right, title and interest" consists of "proceeds and receivables related to [the] produce."  [Dkt. No. 385]. Mr. Dusastre testified that:

> Upon Produce Pay's purchase and Debtor's sale of each Asset Pool, Produce Pay assumed all rights, title, and interest in and to the [p]roduce, which necessarily *includes any and all related receivables generated from Debtor's sale of Produce . . .* and Debtor's PACA trust rights preserved against its consignment purchasers or *account debtors*.

(Ex. JJJ, Dusastre Decl. at ¶ 20 (emphasis added); *see* Hr'g Tr. 90:4-10).[14]

Produce Pay's point seems to be that when the Debtor sold it a Distributed Asset Pool, Produce Pay also purchased receivables, including, implicitly, the Debtor's rights as PACA trust beneficiary.[15]  Produce Pay's argument effectively transforms the Agreement from one calling for

---

[14]      Produce Pay's arguments in this regard are fluid.  In its reply brief, Produce Pay argues that when it purchased a Distributed Asset Pool, it purchased "the right to all related proceeds and receivables therefrom, therefore extinguishing the Debtor's PACA trust rights in and to such [p]roduce."  [Dkt. No. 385].  Such an argument is contrary to Mr. Dusastre's testimony in his declaration.

[15]      Produce Pay has not suggested that the Debtor assigned its contracts with its customers to Produce Pay pursuant to U.C.C. § 2-210, and the Agreement likewise creates no such inference.  Produce Pay's arguments revolve around produce and all derivatives thereof, not contracts.  None of the parties has suggested that PACA trust rights may be inalienable or unenforceable.  The court will therefore not consider those issues.

the sale of produce to one contemplating the sale of accounts receivable, otherwise known as a factoring agreement.

The Debtor and the Committee dispute that the Debtor sold its accounts receivable to Produce Pay. Focusing on the fact that the risk of loss remained with the Debtor at all times under the Agreement, they maintain that the transactions between the Debtor and Produce Pay constitute a financing arrangement, not a true sale. Accordingly, they argue that because Produce Pay did not purchase anything, Produce Pay is not entitled to any rights derived from the Debtor's produce or receivables, including the Debtor's rights as an unpaid PACA trust beneficiary.

PACA does not address the sale of receivables. Therefore, applicable state commercial law continues to control. *See* 7 U.S.C. § 499o; *see supra* at pp. 12-13. Article 9 of the U.C.C. applies to the sale of accounts and payment intangibles, among other things. U.C.C. § 9-109(a)(3).[16] Article 9 recognizes that the nature of a transaction involving the sale of "receivables" is an issue "left to the courts." U.C.C. § 9-109 (cmts. 4-5).

### 1.    The Transfer-of-Risk Test

The substance of the parties' relationship, not the label attached to it, determines whether transactions constitute a true sale or an extension of credit with accounts receivable serving as collateral. *Endico Potatoes*, 67 F.3d at 1068. A court must examine "the parties' practices, objectives, business activities and relationships and determine . . . whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of the transaction." *Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 545 (3d Cir. 1979).

---

[16]    Article 9 of the U.C.C. as adopted by the State of Delaware, Del. Code tit. 6, § 9-101 *et seq*. applies. None of the parties have addressed whether the receivables constitute "accounts" or "payment intangibles" under Article 9. *Compare* U.C.C. § 9-102(a)(2) *with* U.C.C. § 9-102(a)(61). The court declines to speculate on this technical issue without more from the parties. Regardless, any decision on this issue would not change the court's conclusion.

In connection with this issue, the Second, Third, Fourth, Fifth and Ninth Circuit Courts of Appeal have applied a multi-factor test, known as the "transfer-of-risk" test."  *See, e.g.*, *S & H Packing & Sales Co., Inc. v. Tanimura Distributing, Inc.*, 883 F.3d 797, 808 (9th Cir. 2018) (en banc); *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 600-603 (4th Cir. 2010); *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 414-16 (5th Cir. 2003); *Endico Potatoes*, 67 F.3d at 1068-69; *Major*'s *Furniture Mart, Inc.*, 602 F.2d at 545; *Classic Harvest LLC v. Freshworks LLC*, 158 F.Supp.3d 1317, 1325-27 (N.D. Ga. 2015).[17]

The transfer-of-risk test provides that:

> Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor.  If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Endico Potatoes*, 67 F.3d at 1068 (emphasis in original).

In *Endico Potatoes*, the Second Circuit identified the following non-exhaustive list of factors to consider when evaluating the substance of a factoring agreement: (i) the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, (ii) the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, and (iii) whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt.  *Id.*

---

[17]     The court is unaware of any circuit courts of appeal that apply a different test when considering whether a transaction is a true sale or financing arrangement.

The Sixth Circuit Court of Appeals has not considered whether transactions involving the alleged sale of accounts receivable constitute true sales or financing arrangements. The Sixth Circuit has, however, found similar decisions, including the Fourth Circuit's decision in *Nickey Gregory*, to be highly instructive in another context. *See D & A Assocs. Ltd. v. Comerica Bank (In re Artic Express Inc.)*, 636 F.3d 781, 798-801 (6th Cir. 2011) (requiring lender to disgorge funds subject to statutory trust under Motor Carrier Act) (citations omitted). This court therefore predicts that if the Sixth Circuit were confronted with the issue, it would apply the transfer-of-risk test adopted by its sister circuits.

### 2.    *Produce Pay Did Not Purchase Receivables, Including PACA Rights*

As the Debtor and the Committee highlight, numerous aspects of the Agreement are indicative of a financing arrangement, not a true sale. First, the Agreement requires the Debtor to collect receivables from its customers and to remit the Company Proceeds - 50% of the proceeds from the Debtor's receivables, plus commissions and other charges - to Produce Pay. (Ex. G, Agr. at §§ 2.1, 6.1). The Debtor is obligated to pay this amount to Produce Pay even if the Debtor's customers, as account debtors, default on their obligations to the Debtor. (*Id.* at § 6.1). As such, the Debtor, not Produce Pay, carried the burden of any default, setoff or price adjustment by the Debtor's customers.

Second, the Agreement states that in the event the Debtor does not remit the Company Proceeds within thirty days after Produce Pay purchases a Distributed Asset Pool, the sales commission due to Produce Pay will increase pursuant to formulas set forth in the Agreement. (*Id.* at §§ 2.1, 6.2). The Agreement therefore penalized the Debtor, not Produce Pay, if the Debtor's customers failed to pay for the produce.

Third, the Agreement required the Debtor to repurchase Distributed Asset Pools from Produce Pay unless, within sixty days from the date Produce Pay advanced funds to the Debtor, the Debtor repaid those funds, plus commissions and other charges. (*Id.* at § 6.4). Such other charges included any costs incurred by Produce Pay during that sixty day period. (*Id.*). The Agreement further allowed Produce Pay to recover the repurchase price by withholding (seemingly through recoupment or setoff) future payments otherwise due by Produce Pay to the Debtor. (*Id.* at §§ 3.3, 6.4). The Agreement thus not only allowed Produce Pay to recover the funds it initially advanced to the Debtor, but it also increased the amount owed by the Debtor if the Debtor's customers did not remit payment. *See Nickey Gregory*, 597 F.3d at 601-602; *Reaves Brokerage*, 336 F.3d at 414.

Fourth, the risk of any default by the Debtor's customers was overtly placed on the Debtor. Produce Pay did not even attempt to disguise such means of recourse, as the Agreement states that:

> [The Debtor] shall bear all default risk of any purchaser of the Produce. As such, [the Debtor] shall compensate [Produce Pay] based on the first invoiced Gross Sale Proceeds even if a grocer, retailer or other purchaser or end user default on payment after having taken possession of the [p]roduce.

(Ex. G, Agr. at § 6.8). It is hard to imagine an agreement being any clearer regarding the risk of loss than this provision. Unlike a true sale of receivables where the buyer assumes the risk of non-payment by account debtors, the Debtor's payment obligations under the Agreement were wholly-dependent on the amount it owed to Produce Pay, not the proceeds actually realized from the receivables. *See Endico Potatoes*, 67 F.3d at 1069.

Fifth, the Debtor, not Produce Pay, was burdened with all risks and costs associated with any damages from consumption, storage, marketing, and promotion for the produce related to the receivables allegedly purchased by Produce Pay. (Ex. G, Agr. at §§ 4.2, 4.4, 4.8, 6.4). In the event

that any claims were brought by third persons against Produce Pay, the Debtor was required to defend and indemnify Produce Pay. (*Id.* at § 5.4). The Debtor, not Produce Pay, was obligated to procure insurance to protect against any loss to Produce Pay by naming it as an additional insured. (*Id.* at § 10.12).[18] In addition, Produce Pay never suffered any adverse consequences due to recalls, disputes with suppliers, tax liabilities, or otherwise under the Agreement. (*Id.* at §§ 6.7, 7.3). Produce Pay had one material obligation under the Agreement – to loan the Debtor money.

Sixth, the Agreement provides that the Debtor acknowledges it cannot use its accounts, accounts receivable or proceeds from the sale of produce as collateral in connection with loans from third parties. (*Id.* at §§ 3.2, 12.1). The Debtor further acknowledged that it would not offer for sale to Produce Pay any Distributed Asset Pool that could be construed as another person's collateral. (*Id.* at § 12.1). By including such language, the court infers that Produce Pay was concerned (rightly so) that the Agreement could be construed as a financing arrangement, thereby giving it a security interest subordinate to that of Chemical.

Finally, other provisions in the Agreement further support the conclusion that the transactions were part of a financing arrangement, not a true sale of produce or receivables. The Agreement refers to the platform as a mechanism for "alternative financing" that is to be used by the Debtor to notify Produce Pay when it has a Distributed Asset Pool to "finance." (Ex. G, Agr. at p. 1, § 1.2(a)); *see S & H Packing*, 883 F.3d at 799. Prior to execution of the Agreement, the Debtor and Produce Pay discussed the Debtor's need for working capital and credit to be secured by the Debtor's receivables. (Ex. P; Ex. T; Ex. U; Ex. EE; Ex. MM); *see Nickey Gregory*, 597 F.3d at 601. One day after the Agreement was executed, Produce Pay filed a financing statement

---

[18]     To rebut this contention, Mr. Dusastre testified that Produce Pay maintained a foodborne illness insurance policy. (Hr'g Tr. 48:20-22, 59:16-23, 102:3-13). Produce Pay had no obligation whatsoever under the Agreement to obtain its own insurance policy. The Debtor, however, was required not only to procure its own policy naming Produce Pay as an additional payee, but also to indemnify Produce Pay.

in which it identified as collateral the Distributed Asset Pools "and all cash collections from, and all proceeds of, the foregoing." (Ex. Q); *see S & H Packing*, 883 F.3d at 799. While these facts alone are not determinative, they are further evidence that the Agreement was intended as a financing arrangement.

In sum, Produce Pay did not purchase receivables. Instead, it used them as collateral to secure repayment of the loans it made to the Debtor. Because Produce Pay did not purchase the Debtor's accounts receivable, it does not stand in the Debtor's shoes as an unpaid PACA trust beneficiary.

## CONCLUSION

Produce Pay never sold or supplied produce. Nor did it purchase receivables, including the Debtor's rights as an unpaid PACA trust beneficiary. No matter how creative the Agreement may be, it constitutes a financing arrangement. *See Classic Harvest LLC v. Freshworks LLC*, 158 F.Supp.3d at 1326 n.6 (citations omitted) (lender attempted to structure transaction by exploiting existing case law involving factoring agreements in PACA context). Produce Pay is therefore nothing more than a lender who knowingly advanced funds in exchange for a security interest in the Debtor's receivables.[19]

For the foregoing reasons, Produce Pay is not entitled to the protections of a PACA trust beneficiary. The court shall therefore enter a separate order consistent with this Opinion disallowing Produce Pay's claim under PACA.

---

[19]     The court reaches no conclusion regarding attachment and perfection of Produce Pay's security interest.

**Signed: October 18, 2018**





John T. Gregg
United States Bankruptcy Judge